WO         IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


MATTHEW BORGMAN and NANCY ) 
BORGMAN, )
 )
                           Plaintiffs, )
 )
         vs. )
 )
YAMAHA MOTOR CORPORATION, USA, )
 )         No. 3:19-cv-0285-HRH
                           Defendant. )
_____ )


O R D E R

Cross-motions for Summary Judgment

Defendant Yamaha Motor Corporation, U.S.A. moves for summary judgment.[1]  This

motion is opposed by plaintiffs Matthew and Nancy Borgman,[2] and plaintiffs cross-move for

summary judgment.[3]  Plaintiffs' cross-motion is opposed.[4]  Oral argument was requested and

has been heard.

_____

[1]Docket No. 80.

[2]Docket No. 87.

[3]Docket No. 88.

[4]Docket No. 93.

-1-

<u>Facts</u>

Plaintiffs purchased a new 2018 Yamaha AR195 jet boat from Desert Valley Powersports, LLC in Prosser, Washington, on June 6, 2018.[5]  Desert Valley is an authorized Yamaha Boat dealer.  Plaintiffs trailered the boat back to Alaska, where they live.

The boat came with a limited warranty.  Defendant "warrant[ed] that new Yamaha Boats will be free from defects in materials or workmanship for the time period stated herein, subject to certain stated limitations."[6]  The limited warranty provided a five-year warranty for the "hull and deck" and a one-year warranty for "[a]ll other Yamaha Boat components...."[7]  The limited warranty also provided:

> During the period of warranty, any authorized Yamaha Boat dealer, will, free of charge, repair or replace, at Yamaha's option, any parts adjudged defective by Yamaha due to faulty workmanship or material from the factory.  All parts replaced under warranty will become the property of Yamaha Motor Corporation, U.S.A.[8]

The limited warranty further provided that

> [t]he owner of the boat shall give notice to an authorized Yamaha Boat dealer of any and all apparent defects within ten

---

[5]Exhibit 2, Yamaha Motor Corporation, U.S.A.'s Motion for Summary Judgment, Docket No. 80.

[6]Exhibit 6 at 1, Yamaha Motor Corporation, U.S.A.'s Motion for Summary Judgment, Docket No. 80.

[7]<u>Id.</u>

[8]<u>Id.</u>

Case 3:19-cv-00285-HRH   Document 99   Filed 10/24/22   Page 2 of 37

(10) days of discovery and make the boat available at that time
for inspection and repairs at the dealer's place of business.[9]

In addition to being a separate document, the limited warranty was also set out in the Owner's/Operator's Manual that Desert Valley provided to plaintiffs. The Manual also expressly provided that "[w]arranty repair ... must be performed at an authorized Yamaha Boat Dealer."[10]

Mr. Borgman testified that Desert Valley explained the warranty to plaintiffs when they purchased the boat.[11] He also testified that he read the owner's manual for the boat, which contained the warranty.[12]

Mr. Borgman testified that he put the boat in the water two or three weeks after plaintiffs got back to Alaska.[13] Mr. Borgman's stepson, Clayton Meehan, was with him.[14] Upon this first use of the boat, plaintiffs discovered that "[w]ater leaks into the boat" and

---

[9]Id.

[10]Owner's/Operator's Manual at 115, Exhibit 5 at 121, Yamaha Motor Corporation, U.S.A.'s Motion for Summary Judgment, Docket No. 80.

[11]Videotaped Deposition via Videoconference of Matthew Borgman at 72:11-20, Exhibit 3, Yamaha Motor Corporation, U.S.A.'s Motion for Summary Judgment, Docket No. 80.

[12]Id. at 52:2-3.

[13]Id. at 40:8-11.

[14]Id. at 40:14-15.

"[t]he [b]oat also cavitates, which may be caused by a leak. The [b]oat has difficulty in getting up on step, likely because the [b]oat is filled with water and the [b]oat is cavitating."[15]

Mr. Borgman avers that after discovering the problems with the boat, plaintiffs asked Meehan "to contact Anchorage Yamaha to obtain warranty repairs on the [b]oat" and that they "were given an appointment for mid-July 2018."[16] Meehan avers that he "called Anchorage Yamaha, Inc. and described the problem of the [b]oat taking on water. Anchorage Yamaha, Inc. said they could repair the [b]oat under Yamaha's warranty."[17] Mr. Borgman avers that he "delivered the [b]oat to Anchorage Yamaha for the appointment."[18]

On August 22, 2018, Anchorage Yamaha called defendant's Tech Line and advised the representative that the boat "cavitates" and that "the clean out plug is not sealing."[19] Anchorage Yamaha was told to change the clean out plug.[20] Anchorage Yamaha replaced the clean out plug (also called the manhole cover assembly) and indicated on its service

---

[15]Declaration of Matthew Borgman (dated August 11, 2022) at 2, ¶ 6, Docket No. 85.

[16]Id. at 2, ¶ 7.

[17]Declaration of Clayton Meehan at 2, ¶ 3, Docket No. 84. Contrary to defendant's argument, these statements are not hearsay. They are not being offered to prove the truth of the matter, that Anchorage Yamaha was defendant's agent but are being offered to show plaintiffs' state of mind, that they believed that Anchorage Yamaha was doing warranty repair work on the boat.

[18]2022 Borgman Declaration at 2, ¶ 7, Docket No. 85.

[19]Exhibit A at 1, Docket No. 86.

[20]Id.

-4-

record that this was a "warrenty [sic] order[.]"[21] Anchorage Yamaha also noted that if that did not fix the problem, then it should call defendant's Tech Line back.[22]

After getting the boat back from Anchorage Yamaha, plaintiffs put the boat back in the water "in late August/early-September 2018[.]"[23] Mr. Borgman avers that "[t]he boat had the same problem. The boat would not get on step/plane pulling a tube, even at full throttle. The back well was full of water, approximately 30-50 gallons."[24]

Plaintiffs returned the boat to Anchorage Yamaha for repairs. On September 20, 2018, Anchorage Yamaha called defendant's Tech Line and advised that the boat was cavitating when accelerating.[25] The Tech Line "advised dealer to check for air leaks into the pump by adding water to hull and checking for leaks around the impeller shaft, seals, clean out plugs, or cracks in hull. If no leaks found, dealer will need to lake test to duplicate the issue."[26] On December 5, 2018, Anchorage Yamaha again called the Tech Line and reported that the "clean out plug is not sealing[.]"[27] Anchorage Yamaha was advised "to grease the

---

[21]Exhibit B at 1, Docket No. 86.

[22]Id.

[23]Declaration of Matthew Borgman (dated December 9, 2019) at 3, ¶ 8, Docket No. 85.

[24]Id.

[25]Exhibit A at 2, Docket No. 86.

[26]Id.

[27]Id. at 3.

seal and to also check the manhole for being out of round. Dealer advised that the water has started freezing and it may be spring before they can get it worked on due to winter coming fast."[28] Anchorage Yamaha called plaintiffs to come pick up the boat since winter was coming, and Mr. Borgman avers that he picked the boat up on December 14, 2018.[29] Plaintiffs stored the boat in a heated garage over the winter.[30]

Plaintiffs returned the boat to Anchorage Yamaha in late April of 2019. Mr. Borgman avers that on June 21, 2019, he "called Yamaha's customer assistance number because I was frustrated [that] Anchorage Yamaha had not repaired the [b]oat."[31] Mr. Borgman spoke with Andrew Thomas, who works for a temp agency, Coworks, answering customer service calls for defendant's Marine Division.[32] Mr. Borgman avers that he told Thomas about the problems with the boat and "requested Yamaha buy the [b]oat back."[33] Thomas advised Mr. Borgman that he "would reach out to the [dealer] to get an understanding of what[']s going on. Adv[ised] that all buy backs start from the [dealer] level. Once I get in contact with the

---

[28]Id.

[29]2019 Borgman Declaration at 4, ¶ 13, Docket No. 25.

[30]Id.

[31]2022 Borgman Declaration at 3, ¶ 10, Docket No. 85.

[32]Deposition of Andrew Thomas at 5:20-6:6, Exhibit C, Docket No. 86.

[33]2022 Borgman Declaration at 3, ¶ 10, Docket No. 85.

-6-

[dealer] I would reach back out to the cust[omer] and go from there."[34]  Thomas spoke to Anchorage Yamaha and was told that it had "done a number of services but the unit is still cavitating, and the clean out ports were leaking."[35]  Anchorage Yamaha advised Thomas that it would "be getting in contact with tech services today to help figure out what[']s wrong with the unit."[36]

On June 27, 2019, Anchorage Yamaha called the Tech Line to report that the boat "was tested on water, and water coming in near clean out ports.  D[ealer] didn't check where it was coming from.  Was tested with 4 people on the unit."[37]  Anchorage Yamaha was advised "to leave unit on the trailer and check for pressurized leaks, in the jet drive/clean out areas."[38]

On June 28, 2019, Anchorage Yamaha sent a video to the Tech Line of the boat taking off and getting on step.  Anchorage Yamaha advised that "it[']s hard to hear in a video but it cavitates heavily upon takeoff."[39]

---

[34]Exhibit A at 4, Docket No. 86.

[35]Id. at 5.

[36]Id.

[37]Id. at 6.

[38]Id.

[39]Id. at 8.

-7-

On July 1, 2019, the Tech Line asked Anchorage Yamaha if it had

> determined the causes of cavitation in relation to the clean out
> plug?  Has a new one been installed to verify repair?  The
> warranty on this unit ended on 6/6/2019.  Was this issue present
> prior to this, and was the plug removed during winterization?
> These are very likely to warp if left over the winter – especially
> in Alaska.[40]

Mr. Borgman avers that he spoke to Thomas again sometime between July 5 and July 8, 2019 and "told Thomas that Anchorage Yamaha told me Anchorage Yamaha has done all Yamaha repair recommendations, yet still cannot fix the [b]oat.  Thomas was supposed to contact Anchorage Yamaha.  I never hea[r]d back from Thomas."[41]

On July 12, 2019, Anchorage Yamaha advised the Tech Line that it had "tried all suggestions from Yamaha and unit still has issues.  Dealer asking what to do.  Not an authorized waverunner dealer.  Asking what[']s next."[42]  On July 15, 2019, Anchorage Yamaha was advised that "this may need to go to an authorized dealer for repairs."[43]  On July 24, 2019, Anchorage Yamaha was advised

> to order all parts needed and complete the repairs if they feel
> capable of completing the work correctly.  [Andrew Smith of
> Anchorage Yamaha] is confident they can complete the repairs
> successfully and will lake test when completed.  Dealer says
> they have [many] hours invested into this unit already and will

---

[40]Id. at 8-9.

[41]2022 Borgman Declaration at 4, ¶ 12, Docket No. 85.

[42]Exhibit A at 12, Docket No. 86.

[43]Id.

-8-

have many more invested to complete the through hull fitting and lake test. Says lake is over 1hr away each direction plus time on the water. Has lake tested a hand full of times already. Advised let['s] get the issue repaired first and we can discuss reimbursement when the unit is done.[44]

On August 2, 2019, plaintiffs made a formal demand that the boat be bought back and their money be refunded.[45]

On August 21, 2019, Chris Farrell contacted Smith at Anchorage Yamaha and asked for "any open and closed repair orders you have for" the boat.[46] Farrell is a "watercraft district service manager" for defendant and his job is to "[s]upport our dealer network for their watercraft service needs."[47] Anchorage Yamaha sent Farrell two invoices.[48] One was the service record set out above that indicated that the manhole cover assembly had been replaced under warranty.[49] The other one was dated May 2, 2019, and indicated that Anchorage Yamaha worked on the boat until July 24, 2019, when it was advised by defendant "not to continue repairs[.]"[50]

---

[44]Id.

[45]Exhibit 10, Yamaha Motor Corporation U.S.A.'s Motion for Summary Judgment, Docket No. 80.

[46]Exhibit E at 1, Docket No. 86.

[47]Deposition of Christopher Farrell at 17:19-24, Exhibit H, Docket No. 86.

[48]Exhibit E at 1, Docket No. 86.

[49]Exhibit B at 1, Docket No. 86.

[50]Id. at 2.

-9-

However, Mr. Borgman avers that he called Anchorage Yamaha on September 5, 2019, and was told that Anchorage Yamaha was still trying to fix the boat but was waiting on parts from defendant.[51] And, on September 13, 2019, Anchorage Yamaha was advised that "if customer or legal party has not instructed to stop repairs, please continue with repairs to the through hull fitting and call back after confirming the repair is complete."[52]

Plaintiffs picked up the boat on November 23, 2019, after Anchorage Yamaha called them and requested that they do so, even though the boat was still not fixed.

Plaintiffs commenced this action on October 4, 2019. Plaintiffs' second amended complaint contains five counts. Count I is an Alaska Unfair Trade Practices Act (UTPA) claim that defendant violated Section .471(b)(56)[53] of the UTPA. Count II is a claim that defendant violated the UTPA by failing "to make the necessary repairs to conform [p]laintiffs' [b]oat to the warranty."[54] Count III is a claim that defendant violated the Magnuson-Moss Warranty Act ("MMWA") because defendant breached the limited warranty. Count IV is a claim that defendant violated the UTPA because it violated the MMWA. Count V contains two contract claims, a breach of contract claim and a breach of the implied covenant of good faith and fair dealing claim.

---

[51]2019 Borgman Declaration at 6, ¶ 24, Docket No. 25.

[52]Exhibit A at 12, Docket No. 86.

[53]Section .471(b)(56) makes violating the Alaska Marine Product and Motorized Recreational Product Act a violation of the UTPA.

[54]Second Amended Complaint at 5, ¶ 29, Docket No. 39.

-10-

Defendant now moves for summary judgment on all of plaintiffs' claims. In response, plaintiffs have withdrawn Count I,[55] and they cross-move for summary judgment on their claims in Counts II-V.

Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" Arandell Corp. v. Centerpoint Energy Services, Inc., 900 F.3d 623, 628–29 (9th Cir. 2018) (quoting T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)). "'[W]hen simultaneous cross-motions for summary judgment on

---

[55]SEALED Opposition to Defendant's Motion for Summary Judgment at 26, Docket No. 87.

-11-

the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them.'" Tulalip Tribes of Washington v. Wash., 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1134 (9th Cir. 2001)).  "Each motion must be considered on its own merits." Fair Housing Council of Riverside Cnty., Inc., 249 F.3d at 1136 (citation omitted).

As a preliminary matter, defendant argues that plaintiffs' cross-motion should be denied because it is procedurally improper.  This argument is based on the fact that plaintiffs filed their cross-motion for summary judgment eleven days after they filed their opposition to defendant's motion for summary judgment.  Defendant contends that the cross-motion should have been filed at the same time as plaintiffs' opposition and that the cross-motion is an attempt by plaintiffs to present new arguments on the merits of their claims, arguments that could have been presented in plaintiffs' opposition.  Thus, defendant argues that the court should not consider any arguments raised in plaintiffs' cross-motion for summary judgment.

Contrary to defendant's contention, there is no authority that stands for the proposition that a cross-motion for summary judgment must be filed at the same time as an opposition to a motion for summary judgment.  Local Rule 5.1(f)(2) requires that an opposition to a motion for summary judgment and a cross-motion be two separate filings and provides that "the second filing may simply indicate that it incorporates by reference the first filing, and

need not duplicate the first filing in its entirety." But, Local Rule 5.1(f)(2) does not expressly require that the two documents be filed at the same time. Plaintiffs' cross-motion was filed on August 23, 2022, which was prior to the November 23, 2022, deadline for dispositive motions.[56] Plaintiffs' cross-motion for summary judgment was not procedurally improper, and the court will consider the arguments raised in the cross-motion.

Count I

As set out above, plaintiffs have withdrawn Count I. Thus, defendant is entitled to summary judgment on this count.

Count II

Count II is a claim that defendant violated the UTPA by failing "to make the necessary repairs to conform [p]laintiffs' [b]oat to the warranty."[57] The UTPA "'was designed to meet the increasing need in Alaska for the protection of consumers as well as honest businessmen from the depredations of those persons employing unfair or deceptive trade practices. The act protects the consumer from deceptive sales and advertising practices, and it protects honest businesses from their unethical competitors.'" Van v. LLR, Inc., 500 F.Supp.3d 927, 934 (D. Alaska 2020) (quoting Donahue v. Ledgends, Inc., 331 P.3d 342, 353 (Alaska 2014)). "Subsection .471(a) is the UTPA's catchall provision; it states that '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of

_____

[56]Second Amended Schedule and Planning Order at 2, Docket No. 70.

[57]Second Amended Complaint at 5, ¶ 29, Docket No. 39.

-13-

trade or commerce are declared to be unlawful.'" <u>Kenai Chrysler Center, Inc. v. Denison</u>, 167 P.3d 1240, 1255 (Alaska 2007). "Subsection .471(b) contains a long list of subpara-graphs describing types of conduct that are by definition unfair or deceptive acts or practices and are thus unlawful." <u>Borgen v. A & M Motors, Inc.</u>, 273 P.3d 575, 583 (Alaska 2012).

"Under the UTPA, '[a] person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful by AS 45.50.471 may bring a civil action to recover for each unlawful act or practice three times the actual damages....'" <u>Donahue</u>, 331 P.3d at 352 (quoting AS 45.50.531(a)) (emphasis omitted). "Two elements must be proved to establish a prima facie case of unfair or deceptive acts or practices under the Alaska Act: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred." <u>State v. O'Neill Investigations, Inc.</u>, 609 P.2d 520, 534 (Alaska 1980).

There is no dispute that plaintiffs suffered an ascertainable loss of money or property. There is also no dispute that defendant is engaged in trade or commerce. The focus of the dispute here is whether an unfair or deceptive act or practice occurred.

In Count II, plaintiffs rely on the catch-all provision in subsection .471(a) of the UTPA. Plaintiffs allege that defendant violated the UTPA by failing to make the necessary repairs to the boat, or in other words, that defendant breached the limited warranty for the boat. The question is whether defendant's alleged failure to make the necessary repairs to the boat can be considered an unfair or deceptive act or practice.

-14-

"[W]hether an act is 'deceptive' is determined simply by asking whether it has the capacity or tendency to deceive." Borgen, 273 P.3d at 591 (citation omitted). The parties make no argument as to whether defendant's alleged failure to make the necessary repairs to the boat was deceptive. Rather, their arguments focus on whether the alleged failure to make the necessary repairs was an unfair act or practice.

The Alaska Supreme Court has

adopted a multi-factored approach that should be considered in determining whether an "unfair" practice existed.

The factors are:

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or other-wise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers....

Id. at 590 (citations omitted).

Defendant first argues that plaintiffs' UTPA claim in Count II fails because plaintiffs are not entitled to enforce the limited warranty as they did not satisfy all conditions to recovery under the limited warranty. "[T]he non-occurrence of a condition precedent precludes an action by the promisee to enforce the contract[.]" Kennedy Associates, Inc. v. Fischer, 667 P.2d 174, 178 (Alaska 1983). A "condition precedent is something that the parties agree must happen before a right to enforce a contract accrues[.]" Id. at 178, n.4. "If

-15-

the occurrence or the nonoccurrence of a condition is required by the manifested intention of the parties, a rule of strict compliance traditionally applies, despite its harshness." <u>Dick Fischer Development No. 2, Inc. v. Dep't of Admin., State of Alaska</u>, 778 P.2d 1153, 1155 (Alaska 1989).

Defendant argues that plaintiffs did not comply with the notice and presentment conditions precedent. As set out above, the limited warranty provided that

> [t]he owner of the boat shall give notice to an authorized
> Yamaha Boat dealer of any and all apparent defects within ten
> (10) days of discovery and make the boat available at that time
> for inspection and repairs at the dealer's place of business.[58]

Defendant argues that plaintiffs failed to comply with the 10-day notice condition precedent because it is undisputed that Anchorage Yamaha is not "an authorized Yamaha Boat dealer." Because plaintiffs only contacted Anchorage Yamaha after they first used the boat, defendant argues that there can be no dispute that plaintiffs did not meet the notice condition precedent.

Defendant also argues that plaintiffs failed to meet the presentment condition precedent. Defendant argues that the presentment condition precedent requires that a warranty claim be submitted to it by an authorized Yamaha Boat dealer. This presentment condition precedent seems to come from The Marine Products and Motorized Recreational Products Act ("MPA"), which requires authorized dealers to "make all claims for warranty

---

[58]Exhibit 6 at 1, Yamaha Motor Corporation, U.S.A.'s Motion for Summary Judgment, Docket No. 80.

reimbursement in the manner established by the manufacturer." AS 45.27.130(b). An authorized Yamaha Boat dealer can either get preauthorization to do warranty work or submit a warranty claim after the work has been completed.[59] It is undisputed that Anchorage Yamaha never got a preauthorization to do any warranty work on the boat nor did it ever submit a claim for the repair work that was done. Thus, defendant argues that plaintiffs failed to comply with the presentment condition precedent.

But the issue here is whether plaintiffs complied with the conditions precedent in the limited warranty, not whether the plaintiffs complied with the MPA. The limited warranty requires that the owner of the boat give an authorized Yamaha Boat dealer notice of any defects within 10 days of discovery and that the owner make the boat available, or "present" the boat, to the authorized Yamaha Boat dealer. The limited warranty says nothing about submitting a warranty claim to defendant, a condition that would not even have been in plaintiffs' control to meet.

As to whether plaintiffs complied with the notice and presentment conditions precedent in the limited warranty, there is no dispute that plaintiffs gave Anchorage Yamaha notice of the alleged defects within 10 days of discovery and that they made the boat available to Anchorage Yamaha. Although Anchorage Yamaha is not an authorized Yamaha Boat dealer, plaintiffs argue that giving notice to Anchorage Yamaha and presenting the boat

---

[59]Farrell Deposition at 14:24-17:1, Exhibit 1, Yamaha Motor Corporation, U.S.A.'s Reply Brief [etc.], Docket No. 90.

to Anchorage Yamaha is the same as giving notice and presenting the boat to defendant itself under either an apparent authority theory or a ratification theory. Plaintiffs argue that if Anchorage Yamaha is defendant's apparent agent for purposes of performing warranty repairs, then they complied with the conditions precedent by giving Anchorage Yamaha notice of the defects and presenting the boat to Anchorage Yamaha for warranty repairs.

Defendant argues that this is an attempt by plaintiffs to do an end-run around the MPA. The MPA is a regulatory scheme governing the rights and responsibilities of manufacturers, dealers, and purchasers of marine products. The MPA provides that "[a] manufacturer shall provide, through the authorized dealer, to the product's ultimate purchaser from an authorized dealer the manufacturer's standard warranty, if any, that is in effect at the time of delivery of the product to the authorized dealer." AS 45.27.100. The MPA further provides that "[a]n authorized dealer shall provide warranty service in accordance with the manufacturer's applicable warranty on all of the manufacturer's products sold by the authorized dealer." AS 45.27.130(a). And, the MPA provides that

> [i]f a product does not conform to a warranty that is applicable to it and the ultimate purchaser of the product reports the nonconformity to the manufacturer of the product or to the manufacturer's authorized dealer during the term of the warranty, the manufacturer or authorized dealer shall make the necessary repairs to conform the product to the warranty.

AS 45.27.180. The MPA defines an "authorized dealer" to "mean[] a person who has entered into a dealership agreement with a manufacturer[.] AS 45.27.390(1).

-18-

Defendant argues that "the common law of agency and apparent authority must be read in conjunction with, and is limited by, the terms of the MPA."[60]  Defendant seems to be arguing that the MPA, with its emphasis on "authorized dealers," precludes plaintiffs from relying on theories of apparent authority or ratification to get around the fact that Anchorage Yamaha was not an authorized Yamaha Boat dealer.

This argument fails.  The MPA expressly states that "[t]he provisions of this chapter do not limit other rights and remedies that may be available to the owner of a product under other provisions of law."  AS 45.27.300.  Nothing in the MPA precludes plaintiffs from relying on common law theories such as apparent authority or ratification.

But even if an apparent authority theory were a viable argument, which it is, defendant argues that this theory cannot save plaintiffs' UTPA claim in Count II.  "Apparent authority is used to hold a principal accountable for a third party's belief about an actor's authority to act as an agent for the principal when the belief is reasonable and is traceable to a manifestation of the principal." Cummins, Inc. v. Nelson, 115 P.3d 536, 541 (Alaska 2005). "Apparent authority is created 'by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.'" Id. at 541-42 (quoting City of Delta Junction v. Mack Trucks, Inc., 670 P.2d 1128, 1130 (Alaska 1983)).  "There are three considerations in evaluating apparent agency: (1) the manifestations

---

[60]Yamaha Motor Corporation, U.S.A.'s Reply Brief [etc.] at 2, Docket No. 90.

-19-

of the principal to the third party; (2) reliance on the principal's manifestations by the third party; and (3) the reasonableness of the third party's interpretation of the principal's manifestations and the reasonableness of the third party's reliance." Id. at 542. "If a principal cloaks its apparent agent with authority to enter into a transaction on its behalf, the principal is liable as if it had entered into the transaction personally." Id. Apparent authority "result[s] in the principal's liability for the acts of the agent or apparent agent, including liability for breach of warranty." Delta Junction, 670 P.2d at 1129. "'Unless the evidence allows but one inference, the question of apparent authority is one of fact for the jury.'" Alaska Demo. Party v. Rice, 934 P.2d 1313, 1319 n.9 (Alaska 1997) (quoting Jackson v. Power, 743 P.2d 1376 (Alaska 1987)).

"A manifestation may be in the form of 'written or spoken words or any other conduct....'" Cummins, 115 P.3d at 542 (quoting Restatement (Second) of Agency § 27 (1958)). "The manifestation may be directly communicated to the third party or may come through signs [and] advertising[.]" Id. For example, in Delta Junction, the "manifestation" evidence included that "Mack, Inc. allowed Alaska Mack to use the term 'Mack' as part of its corporate name. Alaska Mack was listed in trade journals and the Fairbanks telephone directory under the heading 'MACK TRUCKS.' The telephone directory listing displayed the familiar Mack bulldog trademark[.]" Delta Junction, 670 P.2d at 1131. In addition,

> [t]he Alaska Mack dealership bore a large sign on the outside which stated, "Alaska Mack, Inc., Mack Trucks," displaying the Mack bulldog. Inside, the Mack logo and Mack truck posters were prominently displayed in several places. Printed brochures

-20-

> advertising Mack trucks were on Alaska Mack's counter. Alaska Mack did not display promotional materials of any manufacturer other than Mack, nor were there any signs indicating that Alaska Mack was independently operated.

Id.  The Alaska Supreme Court found that this was sufficient evidence to allow a jury to consider the question of "[w]hether [Mack, Inc.'s] acquiescence" in Alaska Mack's use of its name and logo "was sufficient to bind Mack, Inc. under [the City's] theory of apparent authority[.]" Id.

Here, Anchorage Yamaha has numerous signs on the outside of its building that prominently display the "Yamaha" name.[61] One of the exterior signs contains the language: "Anchorage Yamaha: Water Vehicles ... Parts & Service."[62] This signage was recommended and approved by defendant, according to Anchorage Yamaha's dealer agreement.[63] In addition, Mr. Borgman avers that "inside Anchorage Yamaha" there was "a Yamaha logo, posters/pictures of Yamaha products, and sales brochures."[64] This evidence is sufficient to create an issue of fact as to whether defendant manifested to third parties that Anchorage Yamaha was its agent.

_____

[61]Exhibit G, Docket No. 86.

[62]Id. at 2.

[63]Yamaha Motor Corporation, U.S.A. Sales and Service Agreement at 2, ¶ 2.10, Exhibit F, SEALED Opposition to Defendant's Motion for Summary Judgment, Docket No. 87.

[64]2022 Borgman Declaration at 3, ¶ 8, Docket No. 85.

-21-

The court is mindful that, as defendant points out, "the mere use of a trademark and other logos of the defendant is not sufficient to raise a genuine issue of material fact" as to apparent authority. Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1121 (Mass. 2000). But, as set out above, there is more here than mere use of the Yamaha name and logo. There is evidence that defendant approved Anchorage Yamaha's signage, including one exterior sign that at least suggested that Anchorage Yamaha could do warranty repair work on boats. The manifestation evidence is not so strong that the only reasonable inference that could be drawn is that defendant manifested to third parties that Anchorage Yamaha had the authority to do warranty repair work on boats. But the manifestation evidence is sufficient to create a genuine issue of material fact as to that issue.

As for reliance, defendant argues that it would have been unreasonable for plaintiffs to have relied on the Yamaha logos and trademark to conclude that Anchorage Yamaha was authorized to do warranty work on all Yamaha products, including their boat, when some of the signs listed other manufacturers besides Yamaha, such as Suzuki, Atec, and Fish-Rite.[65] But plaintiffs could have relied on the exterior Anchorage Yamaha signage that suggested that Anchorage Yamaha was authorized to do warranty repair work on Yamaha boats. In short, there are questions of fact as to reliance.

[65]Exhibit G at 3, Docket No. 86.

-22-

The reasonableness of plaintiffs' reliance is also a question of fact. Mr. Borgman avers that he was led to believe that Anchorage Yamaha was authorized to do warranty repairs based on his observations, such as

> the use of the name "Yamaha" in Anchorage Yamaha's name; the advertising on Anchorage Yamaha's exterior containing the Yamaha logo, and the name "Yamaha" and the words on Anchorage Yamaha's sign stating it can provide "Parts and Service" for "Motorcycles, Snowmobiles, Outboards, Water Vehicles, ATV", and the atmosphere inside Anchorage Yamaha, which included a Yamaha logo, posters/pictures of Yamaha products, and sales brochures.[66]

Mr. Borgman avers that his belief that Anchorage Yamaha had the authority to act on behalf of defendant was "reinforced" by the fact that the name "Yamaha" and the Yamaha logo were on the repair invoice; that Anchorage Yamaha advised him that it was in communication with defendant about the repairs; that Thomas referred to Anchorage Yamaha as the "dealer", and that plaintiffs were never charged for the repairs.[67]

Plaintiffs acknowledge that Anchorage Yamaha's sign stated that it provided service for "water vehicles" and not specifically "boats." But, they argue that it was reasonable for them to assume that "water vehicles" included "boats." They also argue that the fact that Anchorage Yamaha did not have any disclosure that it was an independent dealer, not a Yamaha Boat dealer, and could not provide warranty repairs on Yamaha boats is another indication that their reliance was reasonable.

---

[66]2022 Borgman Declaration at 2-3, ¶ 8, Docket No. 85.

[67]Id. at 4, ¶ 13.

-23-

On the other hand, defendant points out that Meehan has testified that when he was researching jet boats for plaintiffs prior to their purchase of the boat, he was told by Anchorage Yamaha that it did not sell Yamaha jet boats.[68] Defendant argues that given this information, it would have been more reasonable for plaintiffs to assume that Anchorage Yamaha would not and could not service or repair jet boats since that was a product it did not sell.

In sum, there are questions of fact as to whether Anchorage Yamaha had the apparent authority to do warranty repairs on plaintiffs' boat. And, because there are questions of fact as to that issue, there are questions of fact as to whether plaintiffs are entitled to enforce the limited warranty or whether they are precluded from recovery because they failed to comply with the conditions precedent in the limited warranty.

In the alternative, plaintiffs advance a ratification theory. "Alaska recognizes the common law doctrine of ratification—'an agency doctrine ... where, after a transaction is entered into by a second party purporting to act for a principal, the principal manifests an intent to be bound by the acts of the second party.'" Windel v. Mat-Su Title Ins. Agency, Inc., 305 P.3d 264, 272 (Alaska 2013) (quoting S & B Mining Co. v. N. Commercial Co., 813 P.2d 264, 267 (Alaska 1991)). "The focus is on what occurred subsequent to the agent's act; the scope of the agent's authority becomes irrelevant." Sea Lion Corp. v. Air Logistics

_____

[68]Videotaped Deposition via Videoconference of Clayton Meehan at 29:20-25, Exhibit 5, Yamaha Motor Corporation, U.S.A.'s Reply Brief [etc.], Docket No. 90.

-24-

of Alaska, Inc., 787 P.2d 109, 117 (Alaska 1990). "A principal may ratify the second party's acts either expressly or by silence[.]" Windel, 305 P.3d at 272. "Although ordinarily ratification is a question of fact, silence of the principal effects ratification as a matter of law if the case is so clear that reasonable men could come to but one conclusion." Sea Lion Corp., 787 P.2d at 117-18 (citation omitted).

Defendant first argues that plaintiffs' ratification theory fails because there is no relevant unauthorized act of Anchorage Yamaha that defendant could have ratified. Defendant insists that the only relevant act is the submission of a warranty claim to it by an authorized Yamaha Boat dealer. But, because Anchorage Yamaha has never submitted a warranty claim to defendant, defendant argues that there is no relevant conduct by Anchorage Yamaha that defendant might have ratified. Defendant argues that all plaintiffs have presented is some evidence that defendant, via its Tech Line, provided technical support to Anchorage Yamaha, and defendant argues that it is likely that it would have provided technical support regardless of whether the repair work was warranty work or not.

Whether or not Anchorage Yamaha presented a warranty claim to defendant is not a material fact. The relevant act here is the repair work Anchorage Yamaha did on the boat. And, the question is whether defendant could be said to have ratified the repair work as warranty work.

Plaintiffs first argue that defendant ratified the warranty repairs expressly. "[A] principal may affirm the unauthorized conduct of another through conduct 'manifesting that

-25-

he consents to be a party to the transaction, or by conduct justifiable only if there is a ratification.'" Johnson v. Olympic Liquidating Trust, 953 P.2d 494, 498–99 (Alaska 1998) (quoting Restatement (Second) of Agency § 93(1) (1958)).

Plaintiffs argue that Andrew Thomas expressly ratified the warranty repairs by Anchorage Yamaha when Mr. Borgman called Thomas in June 2019, and Thomas "assured [Mr. Borgman] Anchorage Yamaha would be able to repair the [b]oat's leak because [defendant] was going to help Anchorage Yamaha diagnose and repair the [b]oat."[69]  Mr. Borgman also avers that Thomas "encouraged him [Mr. Borgman] to allow Anchorage Yamaha two more weeks to repair the [b]oat[.]"[70]  Plaintiffs argue that Thomas' request to plaintiffs to keep the boat at Anchorage Yamaha, rather than taking it to an "authorized Yamaha Boat dealer" is evidence that defendant intended to be bound by Anchorage Yamaha's warranty repairs.  Plaintiffs argue that this was an acknowledgment by defendant of its obligation to repair the boat under the limited warranty and that Anchorage Yamaha could fulfill this obligation.

Plaintiffs also argue that Farrell expressly ratified Anchorage Yamaha's warranty repairs when he requested the repair orders from Anchorage Yamaha and then instructed Anchorage Yamaha to continue attempting to repair the boat.  Specifically, on September 13, 2019, Anchorage Yamaha was advised that "if customer or legal party has not instructed to

---

[69]2022 Borgman Declaration at 3-4, ¶ 11, Docket No. 85.

[70]Id. at 4, ¶ 11.

stop repairs, please continue with repairs to the through hull fitting and call back after confirming the repair is complete."[71]  Plaintiffs argue that the only conclusion that reasonable people could come to based on this evidence is that defendant ratified Anchorage Yamaha's attempted warranty repairs.

The court disagrees.  The foregoing evidence creates a question of fact as to express ratification, but the court cannot conclude that, as a matter of law, defendant expressly ratified Anchorage Yamaha's attempted warranty repairs.

Plaintiffs also argue that defendant ratified Anchorage Yamaha's warranty repairs by silence.  Under Alaska law, there are "two requirements for an otherwise unauthorized act to be ratified by the principal's silence.  The first is that the act sought to be ratified, as with any theory of ratification, must be done by someone who held himself out to the third party as an agent for the principal."  Sea Lion Corp., 787 P.2d at 117.  "Second, the principal must then have failed to act in response under circumstances which according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent...."  Id. (citation omitted).

Plaintiffs argue that Thomas plainly held himself out as an agent for defendant, and that "[s]hould [defendant] not approve such warranty repairs, [personnel] of ordinary experience and habit would expect Thomas to speak out."[72]  Plaintiffs also argue that Farrell

---

[71]Exhibit A at 12, Docket No. 86.

[72]SEALED Opposition to Defendant's Motion for Summary Judgment at 24, Docket
(continued...)

-27-

ratified the warranty repairs by silence because he knew that plaintiffs believed Anchorage Yamaha had been performing warranty repairs on the boat and "[s]hould [defendant] not approve such warranty repairs, [personnel] of ordinary experience and habit would expect Ferrell [sic] to speak out."[73]  In sum, plaintiffs argue that either Thomas or Farrell should have spoken out and told plaintiffs that Anchorage Yamaha was not authorized to do warranty repairs, but since they did not speak out, the only conclusion that reasonable persons could reach is that defendant ratified the warranty repairs done by Anchorage Yamaha.

The court again disagrees.  The foregoing evidence creates a question of fact as to ratification by silence, but the court cannot conclude, as a matter of law, that defendant, by its silence, ratified Anchorage Yamaha's warranty repairs.

But even though there are questions of fact as to whether plaintiffs met the conditions precedent such that they can enforce the limited warranty, defendant argues that plaintiffs' UTPA claim in Count II still fails because it did not breach the limited warranty.  In support of this argument, defendant offers the report of Casey Breen, one of its expert witnesses. Breen has "examined, documented, and tested" plaintiffs' boat and opines that plaintiffs'

---

[72](...continued)
No. 87.

[73]Id. at 25-26.

-28-

boat "does not display any defect in materials or workmanship and comports with Yamaha's Limited Warranty."[74]

In response, plaintiffs make a very conclusory argument that Breen's opinion is inadmissible under Rule 702, Federal Rules of Evidence, because he did not examine the water leaks complained of by plaintiffs or measure the amount of water in the boat's hull after it was operated. Plaintiffs argue that this failure makes Breen's opinion inadequately supported and thus inadmissible.

The court cannot make a decision as to the admissibility of Breen's opinion based on plaintiffs' conclusory argument. If plaintiffs wanted to exclude Breen's opinion, they needed to put forth a much more robust Rule 702 argument. That said, Breen's opinion does create a genuine issue of material of fact as to whether the limited warranty was in fact breached.

But even if there are factual questions as to whether plaintiffs complied with the conditions precedent in the limited warranty and as to whether the limited warranty was in fact breached, defendant argues that it is still entitled to summary judgment on plaintiffs' UTPA claim in Count II because "a mere allegation of a breach of a contractual obligation, without more, does not amount to an unfair or deceptive act or practice."[75] Courts have found that "'[t]o recover for unfair and deceptive trade practices, a party must show

---

[74]Preliminary Investigative Report, Exhibit A at 4, 18, Defendant Yamaha Motor Corporation, U.S.A.'s Opposition to Plaintiffs' Cross-Motion for Summary Judgment, Docket No. 93.

[75]Yamaha Motor Corporation, U.S.A.'s Motion for Summary Judgment at 17, Docket No. 80.

substantial aggravating circumstances attending the breach of contract.'" Kapunakea Partners v. Equilon Enterprises LLC, 679 F. Supp. 2d 1203, 1211 (D. Hawai'i 2009) (quoting Se. Shelter Corp. v. BTU, Inc., 572 S.E.2d 200, 206 (N.C. Ct. App. 2002)). The Alaska Supreme Court has recognized that in order for a breach of contract to constitute an unfair trade practice, there must be an "inequitable assertion of power or position[]" or "egregious and aggravating conduct[.]" Kenai Chrysler Center, 167 P.3d at 1256.

There was no inequitable assertion of power or position here and no reasonable jury could find other egregious or aggravating conduct in defendant's efforts to accomplish a fix of plaintiffs' boat through Anchorage Yamaha. Plaintiffs' argument to the contrary fails.

Plaintiffs argue that the aggravating circumstances were that defendant failed to correct their mistaken belief that Anchorage Yamaha was authorized to perform warranty repairs. Plaintiffs contend that defendant knew that Anchorage Yamaha was attempting to repair the boat and knew that Anchorage Yamaha was not an authorized Yamaha Boat dealer but let plaintiffs continue to believe, through the spring and summer of 2019, that Anchorage Yamaha had the authority to do warranty repairs.

This is not egregious or aggravating conduct. All defendant was doing during the relevant time was attempting to find a way to repair plaintiffs' boat. Defendant may have breached its limited warranty, but no reasonable jury could conclude that its conduct was egregious or aggravating. Because there was no egregious or aggravating conduct on the part

of defendant, plaintiffs cannot establish that defendant's alleged failure to make the necessary repairs to the boat was an unfair act or practice for purposes of the UTPA.

As set out above, the parties' arguments on Count II focused on whether or not defendant's alleged failure to make the necessary repairs to the boat was an unfair act or practice for purposes of the UTPA. But, in their cross-motion for summary judgment, plaintiffs raise some additional arguments concerning whether defendant's conduct was deceptive.

First, plaintiffs argue that they are entitled to summary judgment on Count II because "Anchorage Yamaha's conduct of advertising on its large, prominent sign that Anchorage Yamaha services Yamaha boats violates" subsection .471(a) of the UTPA.[76] Plaintiffs argue that this advertisement is deceptive because it is "'capable of being interpreted in a misleading way.'"[77]

But, as defendant is quick to point out, there are no allegations in plaintiffs' second amended complaint that it violated the UTPA because of Anchorage Yamaha's signage. As the Ninth Circuit has observed, when a "complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." Navajo Nation v. U.S. Forest Service, 535 F.3d 1058, 1080 (9th Cir. 2008). Plaintiffs cannot turn their Count II into a claim that defendant

---

[76]SEALED Cross Motion for Summary Judgment at 11, Docket No. 88.

[77]Id. (quoting AS 45.50.471(a)).

-31-

violated the UTPA because Anchorage Yamaha's signage was deceptive via their cross-motion for summary judgment.

Second, plaintiffs contend that Count II alleges a violation of AS 45.50.471(b)(12). Subsection .471(b)(12) makes it unlawful to "us[e] or employ[] deception, fraud, false pretense, false promise, misrepresentation, or knowingly conceal[], suppress[], or omit[] a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged[.]"  This appears to be another attempt by plaintiffs to assert that defendant's conduct in this case has been deceptive, that defendant deceived them by allowing them to believe that Anchorage Yamaha was an authorized Yamaha Boat dealer when defendant knew it was not.  But, plaintiffs' second amended complaint never mentions subsection .471(b)(12), and in Count II, plaintiffs only allege that "[d]efendant engaged in an unfair or deceptive act or practice when [d]efendant failed to make the necessary repairs to conform [p]laintiffs' [b]oat to the warranty."[78]  Plaintiffs' second amended complaint cannot fairly be read as asserting a claim under subsection .471(b)(12) of the UTPA, and "[i]t is well-established that parties cannot amend their complaints through briefing...."  S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013).

---

[78]Second Amended Complaint at 5, ¶ 29, Docket No. 39.

-32-

Because no reasonable jury could conclude that defendant violated the UTPA by failing to make the necessary repairs to the boat, defendant is entitled to summary judgment on Count II. Plaintiffs' cross-motion on Count II is denied.

Count III

Count III is a claim that defendant violated the MMWA because defendant breached the limited warranty. "[T]he Magnuson–Moss Warranty Act creates a federal private cause of action for a warrantor's failure to comply with the terms of a written warranty[.]" Milicevic v. Fletcher Jones Imports, Ltd., 402 F.3d 912, 917 (9th Cir. 2005). "'[A] consumer who is damaged by the failure of a ... warrantor ... to comply with any obligation ... under a written warranty ... may bring suit for damages and other legal and equitable relief ... in an appropriate district court of the United States....'" Id. (quoting 15 U.S.C. § 2310(d)(1)(B)). Such "claims under the Magnuson–Moss Act stand or fall with [a plaintiff's] express and implied warranty claims under state law." Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022 (9th Cir. 2008). Under Alaska law, "[b]reach of an express warranty requires proof of the plaintiff's reliance on an express warranty, that the product failed to perform in accordance with warranty terms, and that such failure caused harm to the plaintiff." Cusack v. Abbott Laboratories, Inc., Case No. 3:16-cv-00166-SLG, 2017 WL 3688149, at *4 (D. Alaska Jan. 17, 2017).

As discussed above, there are genuine issues of material fact as to whether plaintiffs complied with the conditions precedent and as to whether the limited warranty was breached.

-33-

Thus, neither defendant nor plaintiffs are entitled to summary judgment on plaintiffs' MMWA claim in Count III.

Count IV

Count IV is a claim that defendant violated the UTPA because it violated the MMWA. As plaintiffs acknowledge, the Alaska Supreme Court has never considered whether a violation of the MMWA is a per se violation of the UTPA. "If the state's highest appellate court has not decided the question presented," the court "must predict how the state's highest court would decide the question." Orkin v. Taylor, 487 F.3d 734, 741 (9th Cir. 2007).

The MMWA "'allows a consumer to bring a suit where he claims to be damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the MMWA] or under a written warranty, implied warranty, or service contract.'" In re Apple iPhone 3G Products Liability Litig., 859 F.Supp.2d 1084, 1089 (N.D. Cal. 2012) (quoting Schimmer v. Jaguar Cars, Inc., 384 F.3d 402, 405 (7th Cir. 2004)). "'There are two types of written warranties under the [MMWA]: full warranties and limited warranties.'" Id. (quoting Schimmer, 384 F.3d at 405). "The MMWA 'imposes minimum federal warranty standards' for 'full' warranties and provides remedies for their breach." Id. (quoting Schimmer, 384 F.3d at 405). "However, the MMWA does not provide remedies for breach of 'limited' warranties." Id. at 1090. "Instead, the MMWA allows consumers to" enforce limited warranties "'in federal court' by 'borrowing state law causes of action.'" Id. (quoting Schimmer, 384 F.3d at 405). "'Where a plaintiff only alleges a violation of the MMWA

-34-

insofar as a defendant 'may have breached its warranties under state law,' without an allegation that the defendant 'otherwise failed to comply with [the MMWA],' it follows that 'the federal claims hinge on the state law warranty claims.'" Id. (quoting Clemens, 534 F.3d 1017, 1022 n.3).

Here, plaintiffs only allege that defendant violated the MMWA because defendant breached the limited warranty. Plaintiffs have made no allegations that defendant otherwise failed to comply with the MMWA. The MMWA "requires [certain] disclosures in connection with written warranties [and] regulates the substantive content of warranties[.]" Scott v. Jayco Inc., 443 F.Supp.3d 1143, 1150 (E.D. Cal. 2020) (citation omitted). But, plaintiffs have not alleged that defendant failed to comply with these disclosure requirements or that defendant's limited warranty did not meet the substantive content requirements of the MMWA. Rather, plaintiffs' MMWA claim is simply a breach of warranty claim.

As discussed above, the Alaska Supreme Court does not treat a breach of contract (or warranty) claim as a per se violation of the UTPA. Rather, the Alaska Supreme Court has recognized that in order for a breach of contract to constitute an unfair trade practice, there must be an "inequitable assertion of power or position[]" or "egregious and aggravating conduct[.]" Kenai Chrysler Center, 167 P.3d at 1256. The court predicts that the Alaska Supreme Court would treat a MMWA warranty claim the same, that it would require there to be an "inequitable assertion of power or position[]" or "egregious and aggravating conduct[,]" Kenai Chrysler Center, 167 P.3d at 1256, in order for a MMWA claim that is

-35-

based solely on a breach of warranty to fall within the purview of the MMWA. In other words, the court predicts that it is unlikely that the Alaska Supreme Court would find that a MMWA claim which is based solely on the allegation that a limited warranty was breached is a per se violation of the UTPA.

Because plaintiffs' UTPA claim in Count IV is based solely on a MMWA breach of warranty claim, it fails for the same reason plaintiffs' UTPA claim in Count II fails. There is no evidence from which a reasonable jury could conclude that there were any substantial aggravating circumstances associated with the possible breach of the limited warranty. Defendant is entitled to summary judgment on plaintiffs' UTPA claim in Count IV.

Count V

Count V contains a breach of contract claim. "Under Alaska law, a breach of contract claim has three elements: (1) there was a contract between the parties, (2) the defendant breached the contract, and (3) the plaintiff suffered damages." Kelly v. Clear Recon Corp., Case No. 3:19-cv-00185-TMB, 2019 WL 6040439, at *3 (D. Alaska Nov. 14, 2019). As discussed above, there are genuine issues of material fact as to whether plaintiffs complied with the conditions precedent in the limited warranty and as to whether the limited warranty was in fact breached. Thus, neither defendant nor plaintiffs are entitled to summary judgment on the breach of contract claim.

The other claim in Count V is a breach of the implied covenant of good faith and fair dealing claim. "A covenant of good faith and fair dealing is implied in all contracts in

-36-

Alaska, and it prevents each party from doing anything that will injure the right of the other to receive the benefits of the agreement." Alaska Fur Gallery, Inc. v. Tok Hwang, 394 P.3d 511, 516 (Alaska 2017) (citations omitted). "But the covenant's purpose is to effectuate the reasonable expectations of the parties, not to alter or add terms to the contract, and it will not create a duty where one does not exist." Id. (citations omitted).

There is no evidence from which a reasonable jury could conclude that defendant was depriving plaintiffs of the benefits of its limited warranty of the boat. Defendant's conduct was all aimed at providing direction to Anchorage Yamaha about how to fix the boat. In short, there are no genuine issues of material fact as to whether defendant breached the implied covenant. Defendant is entitled to summary judgment on plaintiffs' breach of the implied covenant claim in Count V.

## Conclusion

Defendant's motion for summary judgment is granted in part and denied in part. It is granted as to Count I, Count II, Count IV, and the breach of the implied covenant claim in Count V. It is denied as to Count III and the breach of contract claim in Count V. Plaintiffs' cross-motion for summary judgment is denied.

DATED at Anchorage, Alaska, this 24th day of October, 2022.

/s/ H. Russel Holland
United States District Judge

-37-